IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

EDDIE JAMES LOWERY
AND AMANDA MARIE LOWERY,

Case no. 04-CV-3101-JTM

                    Plaintiff,

**FIRST AMENDED
COMPLAINT,
DESIGNATION OF PLACE OF
TRIAL AND
JURY TRIAL DEMAND**

    -against-

THE COUNTY OF RILEY; RILEY COUNTY
BOARD OF COMMISSIONERS in their official capacities; RILEY COUNTY LAW
ENFORCEMENT AGENCY ("LAW BOARD"); RILEY COUNTY LAW ENFORCEMENT
DEPARTMENT a.k.a. RILEY COUNTY POLICE DEPARTMENT ("RCPD");
THE CITY OF MANHATTAN; MANHATTAN
BOARD OF CITY COMMISSIONERS in their official capacities; THE CITY
OF OGDEN; OGDEN BOARD OF CITY
COMMISSIONERS in their official capacities; WILLIAM "MIKE" WATSON, in his official
capacity, ALVAN JOHNSON, in his official and individual capacity, LARRY WOODYARD, in
his individual capacity, STEVEN FRENCH, in his individual capacity, HARRY L.
MALUGANI, in
his individual capacity, DOUGLASS JOHNSON, in
his individual capacity, ALLEN RAYNOR in
his individual capacity and JOHN DOES 1-10, police
officers and non-uniformed employees of the Riley
County Law Enforcement Department, in their individual
capacities; RICHARD ROES 1-10, supervisory police
officers of the Riley County Law Enforcement Department, in
their individual capacities.

                    Defendants.

Plaintiffs EDDIE JAMES LOWERY and AMANDA MARIE LOWERY, through their

attorneys, the law firms of Cochran Neufeld & Scheck, LLP and Clark & Kellstrom, Chtd. states

as follows:

1.    Plaintiff EDDIE JAMES LOWERY was unconstitutionally arrested, prosecuted and
      convicted and spent more than ten years suffering in state prison for a rape, aggravated
      battery and aggravated burglary that he did not commit.  This gross miscarriage of justice
      was brought about by egregious misconduct of law enforcement officers, who fabricated
      false statements attributed to Mr. Lowery which he had never uttered, in a manufactured
      police report; by lying to conceal the fabricated, false nature of this evidence during
      testimony at preliminary hearings and trial; fabricating and coercing a false confession by
      denying Mr. Lowery access to an attorney, feeding him additional facts, and attributing
      them to Mr. Lowery; and by concealing the true nature of this evidence from prosecutors
      and the defense.  More than ten years after his October 1991 parole, on April 3, 2003,
      Judge Meryl Wilson of the District Court of Riley County vacated the convictions and
      dismissed the charges finding Mr. Lowery "actually innocent" based on testing of DNA
      evidence by both law enforcement and independent laboratories that conclusively
      excluded him as the rapist.

2.    When he was arrested on July 27, 1981, Mr. Lowery was a young man, serving as a clerk
      in the First and Sixty-Third Armored Division in the United States Army.  By chance he
      was involved in a minor automobile collision in the neighborhood where a rape had
      occurred the same night.  Riley County Police officers had no evidence, physical or
      testimonial, linking Mr. Lowery (or anyone else) with any crime.  The victim of the rape
      could not describe her attacker's appearance at all.

3.    Rather than properly investigating the crime to find the true attacker, who has never been
      found, Riley County police officers Harry Malugani and Douglass Johnson decided to

2

fabricate false evidence against an innocent man, by trying to feed to Mr. Lowery, fact by

fact, the confession that they wanted to hear based on details of how they knew or

believed the crime occurred.  After coercive treatment over a period of two days including

multiple interrogations, lie detector testing, searches of his house, after being refused his

request for an attorney, after not being given any food, and sleep deprived for two days,

Mr. Lowery finally gave in and repeated what the officers told him to say so that he could

leave.  Mr. Lowery, however, refused to sign any written confession prepared by the

officers.

4.      Not content to stop there, these Riley County Police officers further embellished and

fabricated additional false facts that they never had even fed to Mr. Lowery.  This

fabricated evidence was documented in a police report created three days after the

coercive "confession." At two preliminary hearings, at the first trial where the jury could

not reach a verdict, and at a second trial at which Mr. Lowery was convicted, Riley

County police officers provided false, perjurious testimony that Mr. Lowery, voluntarily

and without being fed facts, gave details of how he committed the crime, including facts

that only the perpetrator could have known.  They suppressed from the defense and the

prosecution that instead they had fed him facts and made up additional facts as part of

their effort to fabricate and coerce a confession.

5.      Mr. Lowery steadfastly maintained his innocence.  Nevertheless, as a result of

defendants' unconstitutional and tortuous conduct, Mr. Lowery was imprisoned for ten

harrowing years, mostly at the Lansing Correctional Facility; Mr. Lowery was

incarcerated upon his arrest, on July 27, 1981, through his January 7, 1982 conviction for

3

rape, aggravated battery, aggravated burglary and sentence for eleven years to life, and until he was released in 1991 on parole only after having to agree to participate in sex offender treatment. Indeed, during more than ten years following his release in 1991, Mr. Lowery had to suffer the constant humiliation of having to report to the Sheriff's Department in Clay County, Missouri several times each year as a sex offender, and his name was published in a local newspaper as a sex offender.

6.     After the law firm of Clark & Kellstrom, Chtd. and Innocence Project of Cardozo Law School became involved in the case, a clerk of the court discovered the biological evidence in this case in a corner of a courthouse vault. Additional biological evidence was later discovered in the custody of the Kansas Bureau of Investigation. In 2002, DNA testing on that evidence excluded Mr. Lowery as the source for semen found on the victim and bed sheets. Twenty-one years after Mr. Lowery's conviction, on April 3, 2003, upon Mr. Lowery's motion, joined by the State of Kansas, Judge Meryl Wilson of the District Court of Riley County dismissed the convictions and vacated the sentences on the basis of actual innocence.

7.     Based on this DNA exoneration, we now know to a moral certainty that not only is Mr. Lowery innocent of the crime for which he served ten years in prison, but that he could not have "confessed" to the specific details of a crime that he did not and could not have known anything about. Only the real perpetrator and the police officers that were investigating the crime could have been privy to the non-public details that Riley County officers claimed he offered. The only way that Mr. Lowery could have uttered any details of the crime is that Officers Malugani and Johnson fed those facts to him. Indeed the

4

officers fed Mr. Lowery certain facts, completely fabricated other admissions and then perjured themselves during preliminary hearings and during both of his trials.

8.  Beyond compensating Mr. Lowery for the approximately ten years and three months that he spent in prison, and the additional ten years and five months he was wrongfully identified to the public as a sex offender, this action seeks to redress the unlawful Riley County policies, practices or customs that led defendants to violate his constitutional rights as guaranteed by the First, Fourth, Sixth, Ninth and Fourteenth Amendments of the United States Constitution, and the laws of the State of Kansas.

## JURISDICTION

9.  This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth, Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution, and the laws of the State of Kansas.  Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, and 2202.  Plaintiff further invokes the supplemental jurisdiction of this Court to adjudicate state law claims pursuant to 28 U.S.C. § 1367.

10.  Venue is proper in this district under 28 U.S.C. § 1391(b).

## THE PARTIES

11.  Plaintiff Eddie James Lowery was at all times material to this complaint at the time of his arrest and conviction, a resident of the State of Kansas.  He is now a resident of the State of Missouri.

12.  Plaintiff Amanda Marie Lowery is the daughter of Eddie James Lowery and at all times relevant to this Complaint a resident of the State of California.

13.   Defendant Harry L. Malugani is or was a member of the Riley County Law Enforcement Department ("RCPD").  At all times relevant to this complaint, he was a duly appointed and acting police officer of the RCPD with the rank of investigator, acting under color of law and in his individual capacity pursuant to the statutes, ordinances, regulations, policies, customs and usage of Riley County and the State of Kansas.

14.   Defendant Douglass Johnson is or was a member of the Riley County Police Department. At all times relevant to this complaint, he was a duly appointed and acting police officer of the RCPD with the rank of investigator, acting under color of law and in his individual capacity pursuant to the statutes, ordinances, regulations, policies, customs and usage of Riley County and the State of Kansas.

15.   Defendant Allen Raynor is or was a member of the RCPD.  At all times relevant to this complaint, he was a duly appointed and acting police officer of the RCPD with the rank of sergeant, acting under color of law and in his individual capacity pursuant to the statutes, ordinances, regulations, policies, customs and usage of Riley County and the State of Kansas.

16.   Defendants John Doe, whose identities are currently unknown, represent those employees of the Riley County Police Department, acting in their individual capacities, and acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs and usage of Riley County and the State of Kansas, who participated in the investigation that lead to Mr. Lowery's wrongful conviction.

17.   Defendant Steve French is or was a member of the RCPD.  At all times relevant to this complaint, he was a duly appointed an acting police officer of the Riley County Police

6

Department with the rank of lieutenant, acting under color of law and in his individual

capacity pursuant to the statutes, ordinances, regulations, policies customs and usage of

Riley County and the State of Kansas,who had supervisory authority over Malugani,

Johnson, and John Doe police officers that participated in the investigation that lead to

Mr. Lowery's wrongful conviction.

18.     Defendant Alvan D. Johnson is or was a member of the RCPD.  At all times relevant to

this complaint, he was the director of the  Riley County Police Department, acting under

color of law and in his official and individual capacity pursuant to the statutes,

ordinances, regulations, policies customs and usage of Riley County and the State of

Kansas,who had supervisory authority over Malugani, Johnson, and John Doe police

officers that participated in the investigation that lead to Mr. Lowery's wrongful

conviction.

19.     Defendant Larry Woodyard is or was a member of the RCPD.  At all times relevant to

this complaint, he was a duly appointed and acting captain of the RCPD with the rank

Captain, acting under color of law and in his individual capacity pursuant to the statutes,

ordinances, regulations, policies customs and usage of Riley County and the State of

Kansas.

20.     Defendant William "Mike" Watson, in his official capacity, is the duly appointed

Director of the Riley County Law Enforcement Department and all powers which would

normally be exercised by the Riley County Sheriff or by City Marshall, chief of Police or

City Marshall of Police for all the cities located in Riley County are vested and conferred

upon the Riley County Law Enforcement Department director per Kansas law K.S.A. 19-4436.

21.    Defendants Richard Roe, whose identities are currently unknown, represent those employees of the Riley County Police Department, acting in their individual capacities, and acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs and usage of Riley County and the State of Kansas, who had supervisory authority over Malugani, Johnson, and John Doe police officers that participated in the investigation that lead to Mr. Lowery's wrongful conviction.

22.    The County of Riley is a body corporate and politic empowered to exercise home rule. The Riley County Board of County Commissioners acting in their official capacity,  is a duly designated policymaking entity for the County under Kansas law K.S.A. 19-101 et. seq.

23.    Riley County Law Enforcement Department, also known as the Riley County Police Department ("RCPD"), is a duly designated law enforcement agency organized under Kansas Statutes Annotated § 19-4424-45 *et seq.*

24.    The Riley County Law Enforcement Agency ("The Law Board") is a duly designated law enforcement agency organized under Kansas Statutes Annotated § 19-4424-45 *et seq* and is commonly known as the Law Board or the Riley County Law Board.

25.     The City of Manhattan is a municipal corporation empowered to exercise home rule. The Manhattan Board of City Commissioners , acting in their official capacities, is a duly designated policymaking entity for the city pursuant to Kansas law K.S.A. 12-1001 et. seq.

8

26.   The City of Ogden is a municipal corporation empowered to exercise home rule.  The Ogden Board of City Commissioners, acting in their official capacities, is a duly designated policy making entity for the city pursuant to Kansas law K.S.A. 12-10a01 et. seq.

27.   Riley County, the City of Manhattan and the City of Ogden at all times relevant have delegated law enforcement and related policymaking powers to the Law Board, through enactment of a proposition all as authorized by K.S.A. 19-4424 et. seq.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

28.   In 1981, Eddie James Lowery was 22, serving as a clerk for the First and Sixty-Third armored division in the Unites States Army at Fort Riley, Kansas.  He had a spotless military record.  He had no prior criminal record aside from a misdemeanor for driving while intoxicated when eighteen years old.  He lived in Ogden, Kansas, and was married but recently separated from his wife. He had a two year old daughter, Amanda Marie Lowery.

29.   Arta Wright Kroeplin, was 74 years old, a white female who also lived in Ogden, Kansas.  On July 26, 1981, early in the morning, she was asleep.  An assailant gained entry to her house by cutting the screen door and then unlocking the screen door, opening the back door which was ajar, entering her bedroom, holding a knife to her throat, covering her face, striking her head several times, raping her, penetrating and ejaculating. She called the police after her assailant left.

30.   Riley County Police Department Officers Stanley Conkwright and an Officer Broussard then arrived, at about 3:30 in the morning.  Kroeplin was taken in an ambulance to St.

9

Mary's Hospital for medical assistance, where vaginal swabs were taken. The victim's bedding and nightgown were taken into evidence based on stains observed on each.

31.    At the hospital, Officers Conkwright and Jennifer Malugani spoke to Kroeplin regarding the attack. Kroeplin could offer no descriptive details of any kind as to her attacker. According to his July 27, 1981 police report, Officer Conkwright asked, "Do you have any idea what race the man was?" Kroeplin responded, "No I don't have any idea." She stated she could not hear his voice, and that she had poor hearing so could not tell what he had said to her. She had no idea how tall he was, and as for his weight "he was just medium." Thus, the Riley County police had no description or any information at all about the attacker.

**Riley County Officers Fasten Upon Lowery**

32.    Meanwhile, early in the morning of July 26, 1981 Lowery had several friends visiting for a late night party. Lowery left to go to the local Mini Mart a few blocks away at 1 or 2 a.m. to buy cigarettes. On the way back home, driving down his street, which was a dark street without street lights, he accidentally hit the back of a parked car. He hit his chin on the steering wheel, and was bleeding badly. He wiped off some of the blood using his shirt as a bandage.

33.    Charles Adams, who owned the car, called the police, around 3:25 or 3:30 a.m. Officer Davis from the Riley County Police Department finally arrived at about 4:00 am. Davis spoke to Mr. Lowery, and then brought him home to his trailer. Lowery's friend then helped Lowery push his damaged car back to his trailer.

**The Fabricated "Confession"**

10

34.     The next day, July 27, a Monday, Lowery returned to work at the Army base, having had very little or no sleep. That afternoon, he received a message from Investigator Harry L. Malugani of the Riley County Police asking him to come to the police station to discuss the automobile accident. Lowery was cooperative, and agreed to talk to the officers. His car was still broken, so the police officers Malugani and Douglass Johnson brought him that afternoon to the police station in Manhattan, Kansas. There, he was taken to a small interrogation room where he spoke to Malugani and Johnson. At 4:30 p.m. he signed a Miranda waiver.

35.     Upon signing that waiver, the officers immediately switched tacks, stopped discussing the automobile accident, and began to interrogate him regarding the rape of Kroeplin. Investigator Malugani informed Lowery that there was a burglary and rape in the neighborhood near his car accident at about the same time as the accident. Lowery repeatedly told them he did not know anything about a rape and stated that he was at a party at home that evening. He said he thought they were going to ask him about the car accident. They continued to ask him questions about the rape, for two or three hours.

36.     The officers repeatedly told Lowery that they thought he committed the rape. Lowery was never told he could leave and was never told that he was not under arrest.

37.     Lowery throughout denied that he knew anything about any rape. Still cooperating as best as he could, at 5:48 p.m., Lowery provided a signed consent to a search of his car and the trailer in which he lived. Officers Malugani and Johnson took Lowery back home to Ogden and performed searches on his trailer.

11

38.    Lowery was asked to come to the police department the first thing the next morning, at

8:30. Lowery's car was damaged, so the next morning, July 28, both Investigator

Malugani and Johnson picked him up, and brought him to the police station. On the way

to the police station, Malugani asked if Lowery had a good night's sleep, and Lowery told

him that he did not sleep too much. In addition to not having had much sleep the past

two days, Lowery had not eaten anything that morning.

39.    Lowery was placed in a small interview room. Malugani and Johnson asked him to sign

another Miranda waiver, and Lowery signed the waiver at 8:51 a.m.

40.    For some time, Officers Malugani and Johnson began asking Lowery questions about the

rape and telling him that they knew that Lowery committed the crime and that they could

prove that he committed the crime. Lowery denied repeatedly knowing anything about

the crime. Lowery was not offered anything to eat.

41.    Lowery then asked Malugani if he could see a lawyer. Malugani refused this request for

counsel, and told Lowery that he did not need one because he was not under arrest and

they just wanted to ask him some questions.

42.    Lowery was then asked to take a polygraph test, which he agreed to do. He was taken to

Sgt. Allen Raynor, who administered the polygraph test, according to his own report,

from 9:45 to 12:45.

43.    At the conclusion of the polygraph test, Lowery was told he had failed the test and that

Sgt. Raynor believed he committed the crime. At this point, Lowery was exhausted from

lack of sleep, from being grilled for hours during the polygraph examination, and because

he was provided nothing to eat that day.

12

44.     Sometime and around 12:45 or 1:00 p.m., the polygraph test was completed and

        Malugani and Investigator Douglass Johnson immediately met with Lowery in an

        interrogation room.  They told him again repeatedly that they believed that he committed

        the burglary and rape.  Malugani took the lead in the interrogation.  Malugani repeatedly

        told Lowery to admit that he commit the crime.  Malugani told Lowery that he should not

        have taken the polygraph, and suggested that the polygraph test had indicated Lowery was

        not being truthful.  Malugani began raising his voice and stated, "he had ten more years

        left on the force and if it took him the ten years he was going to prove that [he] caused

        these crimes."

45.     After further interrogation in which the officers repeatedly told Mr. Lowery that they

        knew he had committed the crime and should confess, Lowery began to break down

        emotionally and was crying.  He was particularly upset because, as he told the officers,

        his sister had been raped a year and a half before, and his brother had been killed, and he

        could never commit a violent crime like what he was being accused of.  Lowery also

        believed that the officers would not let him leave the interrogation room unless he told

        them what they were demanding to hear, especially where his request for a lawyer had

        been refused.  Again, Lowery was exhausted from the questioning, lack of sleep and he

        had still not eaten anything that day.

46.     Due to the fact that Lowery had no involvement in the Kroeplin rape, he had no

        knowledge of the details of the crime.  The officers proceeded to try to feed him details

        only known to the officers and the real perpetrator, fact by fact, and to coerce Mr. Lowery

        into accepting them.

                                              13

47.    The officers fed specific details to Mr. Lowery that they knew or believed to be true based upon their investigation of the crime thus far, including that the perpetrator:

   a.  entered the house with the intent to burglarize it;

   b.  "busted open" a screen door with his hands and went inside;

   c.  picked up a knife in the kitchen;

   d.  heard a noise, so walked down a hallway;

   e.  stopped at a bedroom door;

   f.  entered a room where he saw a person lying in a bed;

   g.  startled that person;

   h.  noticed that this person was wearing a nightgown;

   i. jumped on the bed;

   j.  placed a pillow or covers over the person's head, when she began to sit upright;

   k.  struck the person with the butt of a knife;

   l.  noticed that the person was wearing underwear;

   m.  committed a rape.

48.    Again, Mr. Lowery had no personal knowledge of any facts concerning the rape of Ms. Kroeplin, and no physical evidence tied him to the crime. The police officers Malugani and Johnson simply fabricated these statements by feeding to him certain facts of the crime and then lying in their written report and in numerous hearings under oath that Mr. Lowery had *volunteered* each of these distinctive facts with no prompting. Many of these facts Mr. Lowery did not even repeat back to the officers, but instead he simply nodded or verbally assented to their description of the crime.

49.   Finally, Lowery asked for a break, and received a cup of coffee; he still had not been provided any food that day and had not eaten anything.

50.   The officers returned and asked him to sign a written statement, or record a statement. Lowery refused to do either. He again requested to see an attorney, and a second time, he was refused access to an attorney.

51.   He was then taken back to his trailer in Ogden, where the officer wanted to obtain the shirt that he was wearing the night of July 26, which he provided to them. The officers next took him to St. Mary's Hospital to take his blood. Because Mr. Lowery had never voluntarily confessed and his statements were fabricated, there was no probable cause to execute these searches.

52.   Malugani next typed a written arrest report. That report, prepared at 4:20 p.m., falsely stated that "After subject Lowery was read the Miranda warning he admitted to the Aggravated Burglary, Aggravated Battery and Rape case 81-4777," and also that "Lowery was arrested on probable cause" and was booked in Riley County Jail. The officers then took Lowery to the Riley County Jail, where Lowery was fingerprinted, photographed and booked, at 4:37 p.m.

53.   A supplemental report dated July 31, 1981, and signed by Johnson, stated in part:

>       Upon questioning suspect Lowery indicated that in fact he had torn open the screen door of the victim's residence and pushed open inside door. The inner door had been unlocked and left ajar by victim Kroeplin prior to going back to bed.
>       Suspect Lowery stated upon entering the residence he picked up a silver kitchen knife and "rumbled" around inside the residence. Suspect Lowery indicated he then heard the victim stirring and found her lying in the bed. Suspect Lowery stated he was afraid she would wake up and see him so he covered her face with a pillow and jumped on top of her in bed.

15

Suspect Lowery indicated the victim was struggling and he hit her in the head with the handle of his knife.

Suspect Lowery indicated he then slid his pants off and pull the victim's gown off and then raped the victim Kroeplin.

Suspect Lowery stated he then threw the knife away inside the residence, fled to his vehicle and left the area.

The Ro's asked suspect Lowery to again tell the story and he did so with no change in the events or details.

54. The arrest was performed by Investigators Malugani and Johnson, without the benefit of an arrest warrant, and the "probable cause" determination made by such officers was based solely on the fabricated, coerced, and false confession, and false arrest report, and thus there was no probable cause for arrest.

55. Not only did the police report fail to mention that Mr. Lowery had simply repeated facts provided to him and volunteered none of this information, in addition, significant facts in the police report were false and were not facts that had even been fed to Mr. Lowery. The officers embellished their supplemental report with new fabricated facts including that the perpetrator:

a. entered through the back door of the victim's residence;

b. "tore open" the screen door, and entered where the inner door had been left ajar;

c. "rumbled" around the house;

d. entered first the kitchen;

e. found a silver handled knife in a kitchen;

f. covered the victim's face with a pillow;

g. observed that the victim was struggling;

h. hit the victim with the handle of a knife on the head;

i. took off the victim's gown;

16

j. before leaving, threw the knife to the floor.

None of these facts were fed to Mr. Lowery or uttered by him during the interrogation, and all were totally fabricated by the defendant officers Malugani and Johnson.

56.  Further, despite the fact the confession was coerced and fabricated and there was no other evidence linking Mr. Lowery to the crime, and despite the July 31 police report stating that the "investigation continues," upon information and belief, the officers failed to investigate other leads or suspects, and thus the true assailant remains unknown to this day.

**Trial, Conviction, Incarceration**

57.  The first trial was held in November 1981.  At that trial, the defendant made a motion to suppress the confession, which he alleged was coerced.  The Court on Nov. 12, 1981 denied defendant's motion to suppress the confession.  The first trial nevertheless ended in a hung jury on Nov. 19, 1981.  A second trial was held on Jan. 5, 6, and 7, 1982.

58.  During the suppression hearing and at trial, Lowery continued to maintain his innocence, and described how he repeatedly denied ever taking part in a rape, but that the officers fed him facts.

59.  At the preliminary hearing on September 4, 1981, at the suppression hearing on November 12, 1981, and at trial, both Malugani and Johnson testified at length, falsely, that Lowery offered them information voluntarily, that they did not feed him information, and that the confession was not fabricated, further illustrating their bad faith.  In doing so, Malugani and Johnson were complaining witnesses who actively instigated, initiated and

17

perpetuated the prosecution of Mr. Lowery, by providing through their testimony the only significant evidence supporting probable cause.

60. Further, Malugani and Johnson added in their testimony still more new facts, which they falsely attributed to Mr. Lowery, that they had not fed to Mr. Lowery nor included in the supplemental police report, including that Mr. Lowery described:

a. driving up and parking by the side of a house in Ogden;

b. the house was white;

c. the house was on a corner;

d. entering by using his hand to tear open the screen door and reaching inside and lifting the latch to the screen door;

e. picking up a silver table knife, a dinner knife;

f. walking down a hallway

(or in Malugani's testimony a living room area);

g. being frightened that the woman would wake up and see him, so jumping on the bed;

h. striking the victim with the handle of the knife in the head several times;

i. describing that he "screwed" the victim;

j. leaving the same door that he entered.

These lies all exemplify their bad faith.

61. Although Mary Cortese of the Kansas Bureau of Investigation (KBI) Laboratory testified for the State concerning her serological testing, she concluded unremarkably that 38.4%

18

of the people in the world including Mr. Lowery could have contributed seminal fluid found at the scene.

62.   Thus, the only evidence suggesting guilt was the fabricated, false report and testimony of Officers Malugani and Johnson, and then unremarkable serological evidence which had very little probative value.

63.   The second jury convicted Mr. Lowery on Jan. 7, 1982, finding him guilty of rape, aggravated battery, aggravated burglary and Mr. Lowery was sentenced to eleven years to life in prison.

64.   Lowery served approximately ten years and three months incarcerated; for about six months he was incarcerated at the Riley County Jail, and then after his conviction, he was transferred to the Lansing Correctional Facility, where he remained until his parole.  He was paroled in October 1991, only after he finally agreed to confess in order to be eligible to complete a sex offender treatment program.  Mr. Lowery had to suffer the indignity and humiliation, for ten years, of having to report to the Sheriff's Department in Clay County, Missouri several times each year to report as a sex offender; indeed in 2000 a local newspaper published his name as a previous sex offender.  The conviction also caused him to have a dishonorable discharge from the military.

## DNA EXONERATION

65.   Mr. Lowery sought post conviction DNA testing, with the assistance of Barry Clark and the Innocence Project at Cardozo Law School.  However, all of the biological evidence was feared to have been lost.

19

66. A clerk of the court, Lynda Wickstrum, made a heroic effort to search all of the courthouse storage areas; she finally found the "rape kit" in a corner of the courthouse vault, where it had been stored since trial.  The Kansas Bureau of Investigation had retained other pieces of biological evidence from the case.

67. September 11, 2002 DNA testing by the Forensic Science Association, and corroborated by testing performed by the Kansas Bureau of Investigation, excluded Lowery as the donor of the semen taken from the victim's body and the bed sheets.

68. Twenty-one years after his conviction, upon Mr. Lowery's motion, joined by the State of Kansas, Judge Meryl Wilson of the District Court of Riley County vacated the convictions and dismissed all charges on April 3, 2003.

69. The Court found that "It is impossible for the defendant to have committed the crimes with which he was convicted based upon the fact that a single assailant attacked the victim leaving semen on the bed sheets and within the victim's body and because the DNA testing has eliminated the defendant as the donor of the semen."  The Court found that "[t]he defendant is actually innocent of the offenses with which he was charged and later convicted."

70. Thus, based on this DNA exoneration, we now know to a moral certainty that not only is Mr. Lowery actually innocent of the crime for which he served ten years in prison, but that he could not have "confessed" to a crime that he knew nothing about.  Only the real perpetrator, and the police officers who were investigating the crime could have been privy to the details that Riley County officers claimed he offered.  We now therefore know to a moral certainty that as Mr. Lowery testified all along, Officers Malugani and

Johnson fabricated Mr. Lowery's confession, by feeding him facts one by one, and

fabricating statements as to additional facts, for a crime he did not commit.

**Systemic Violations at the Riley County Police Department**

71.    Upon information and belief, there was a custom, policy, pattern and practice in Riley

County, and the RCPD, by and through its policymakers, beginning years before the

unjust conviction of Mr. Lowery and continuing throughout his incarceration, of

condoning, encouraging, ratifying and acquiescing in the fabrication of evidence, failing

to investigate alibi evidence, failing to properly obtain probable cause, coercing of

confessions, and failing to disclose exculpatory evidence and adequately investigate

serious crimes, such as the rape of Ms. Kroeplin.

72.    Upon information and belief, the RCPD and policymakers responsible for ensuring that

defendant police officers received adequate training, policy and supervision, failed to do

so in the areas of preventing involuntary confessions, fabrication of evidence, disclosure

of exculpatory evidence to prosecutors, investigation of alibi evidence, and properly

obtaining probable cause for arrest and for prosecution.

73.    Upon information and belief, the RCPD, through its policy-makers failed to adequately

screen, supervise, and/or discipline officers concerning proper investigatory techniques,

obtaining statements from suspects, evidence collection, and Brady obligations.  Indeed,

upon information and belief, Inspector Harry Malugani was widely known by a nickname,

"Dirty Harry," Johnson was referred to by a nickname "Maddog," referring to their

abusive and coercive tactics that they  would use upon civilians. Upon information and

belief, Defendants Malugani and Johnson were well known in the department for their

abusive behavior, excessive drinking, and otherwise improper conduct both on and off the job.  Upon information and belief, although the supervisory defendants had actual notice of their notorious misconduct, they took no steps or grossly inadequate steps to discipline or supervise them.

74.     Further, upon information and belief, despite Lowery's exoneration and the revelation that Riley County officers coerced him and fabricated a confession, the Riley County Police Department has been unwilling to reform its practices and the Department, for example, still does not require taped interrogations.

**Notice of Claim**

75.     The Notice of claim required by Kansas state law was served on defendants and filed with the Clerk and/or governing body of each municipality named as a defendant herein.  Such service and filing occurred  on October 6 and 7th, 2003.  The Notice of claim set forth the information required by K.S.A. 12-105b.  More than one hundred twenty (120) days have passed since the filing of the Notice of claim and the defendant's have not approved the claim in whole or in part.

## DAMAGES

76.     This action seeks damages for the period from July 27, 1981 (the date of Mr. Lowery's interrogation) through the present.   The defendants' unlawful, intentional, willful, purposeful, deliberately indifferent, reckless, bad-faith and/or malicious acts, misdeeds and omissions caused Mr. Lowery to be falsely arrested, maliciously prosecuted, unfairly tried, wrongfully convicted, and to serve over five months in prison pending trial and ten years of wrongful imprisonment, and ten more years on parole or as a registered sex

offender.

77.    As a direct and proximate result of the acts of the defendants, the injuries and damages

sustained by Mr. Lowery, arising from the deprivation of civil rights and claims of

negligence, gross negligence, and negligent infliction of emotional harm include:

violation of his clearly established rights under the Fourth, Fifth, and Fourteenth

Amendments to the Constitution; personal injuries; pain and suffering; severe mental

anguish; emotional distress; extreme fear; economic damages including loss of income;

infliction of physical illness; inadequate medical care; humiliation, indignities, and

embarrassment; degradation; injury to reputation; permanent loss of natural psychological

development; and restrictions on all forms of personal freedom and physical liberty

including but not limited to diet, sleep, personal contact, educational opportunity,

vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family

relations, reading, television, movies, travel, enjoyment, and expression.  Furthermore, as

a direct result of his unjust conviction and imprisonment, many of the effects of these

disabilities continue to plague Mr. Lowery to this day.

78.    As a direct and proximate result of the acts of the defendants, and the resulting unlawful

incarceration of Mr. Lowery, plaintiff Amanda Marie Lowery suffered pecuniary and

non-pecuniary damages in that Ms. Lowery was deprived of those benefits one would

normally expect to derive from the presence of her father, Mr. Lowery.  Ms. Lowery

suffered loss of society, companionship, advice, moral support, family services, attention,

protection, parental care, financial support, mental anguish, bereavement and the stigma

23

of being the child of a man who has been convicted and incarcerated for the reprehensible crime of rape .

79.     All the alleged acts, misdeeds and omissions committed by the defendants described herein for which liability is claimed were done intentionally, willfully, purposefully, knowingly, unlawfully, maliciously, wantonly, recklessly, and/or with bad faith, and said proscribed conduct of defendants meets all of the standards for imposition of punitive damages.

## CLAIMS FOR RELIEF

## FEDERAL CAUSES OF ACTION

## COUNT I

## 42 U.S.C. § 1983 FOURTEENTH AMENDMENT VIOLATIONS: FABRICATION OF INCULPATORY EVIDENCE, SUPPRESSION OF MATERIAL EXCULPATORY EVIDENCE IN VIOLATION OF BRADY V. MARYLAND, FAILURE TO INVESTIGATE, AND COERCION

### A.     Fabricating False Inculpatory Evidence

80.     Mr. Lowery hereby incorporates by reference all of the foregoing and further alleges as follows:

81.     Defendants Malugani, Johnson, Raynor and John Doe police officers, all state actors, acting deliberately, recklessly, or intentionally and under color of law, fabricated statements, including admissions attributable to Mr. Lowery, in police reports and in testimony, pretrial and at trial, concerning the precise details of the crime.

82.     As a direct and proximate result of individual defendants' fabrication of this false inculpatory evidence, violating Mr. Lowery's clearly established Fourteenth Amendment

24

due process rights including the right to a fair trial, along with his Fourth Amendment right to be free from unreasonable seizures, Mr. Lowery was wrongfully convicted and suffered the injuries and damages described above.

**B.     Failure to Disclose Exculpatory and Impeachment Evidence to the Prosecution**

83.    Defendants Malugani, Johnson, Raynor and unnamed police officers, all state actors, acting deliberately, recklessly, or intentionally and under color of law, failed to document or disclose to the prosecutors material exculpatory and impeachment information including, without limitation, that defendant officers fabricated statements, including admissions attributable to Mr. Lowery, in police reports and in testimony, pretrial and at trial, concerning the precise details of the crime.

84.    By failing to disclose this information, defendant police officers violated the Fourteenth Amendment, as interpreted by <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), <u>California v. Trombetta</u>, 467 U.S. 479 (1984), and their pre-1988 progeny, which imposed a clear duty on the defendants not to conceal or suppress obviously exculpatory evidence, and rather to report all material exculpatory and impeachment information to prosecutors.

85.    Acting with recklessness, deliberate indifference, or intentionally by withholding this material exculpatory and impeachment evidence prior to trial, Defendants Malugani, Johnson, Radnor and John Doe officers violated Mr. Lowery's clearly established Fourteenth Amendment right to due process of law as interpreted by <u>Brady v. Maryland</u> and its progeny, undermining confidence in the

outcome of the trial, and directly and proximately causing Mr. Lowery to be wrongfully convicted and to suffer the injuries and damages described above.

### C.    Failure to Investigate

86.    Defendants Malugani, Johnson, Raynor and unnamed police officers deliberately, recklessly, or intentionally and under color of law further violated Mr. Lowery's Fourteenth Amendment rights by failing adequately to investigate the crime to seek out the true perpetrator, disregarding evidence indicating that Mr. Lowery was innocent and evidence pointing to other leads or suspects, and instead attempting to fabricate or coerce a confession.

87.    The actions of the defendant police officers violated Mr. Lowery's clearly established rights under the procedural due process component of the Fourteenth Amendment, including his right to a fair trial and caused his wrongful conviction and the injuries and damages set forth above.

### D.    Coercion

88.    Defendants Malugani, Johnson, Raynor and unnamed police officers deliberately, recklessly, or intentionally, and under color of law further violated Mr. Lowery's Fourteenth Amendment right to a fair trial by compelling Mr. Lowery to make false inculpatory statements that repeated details of the crime that they had fed him, and that were used against him during his criminal trial.

89.    Introduction of those statements during trial violated Mr. Lowery's Fourteenth Amendment right to a fair trial, which bars introduction of statements obtained by use of means that violate Fifth Amendment right to be free from compelled self-incrimination.

26

Such unconstitutional methods were employed here particularly where Mr. Lowery asked for an attorney on July 28, 1981, the defendants Malugani and Johnson refused to provide him one and instead continued the interrogation, and further searched his home and person, violating Mr. Lowery's clearly established right to counsel under the Fifth Amendment as set forth in Miranda v. Arizona, 384 U.S. 436 (1966) and Edwards v. Arizona, 451 U.S. 477 (1981).

90. The actions of the defendant police officers violated Mr. Lowery's clearly established rights under the procedural due process component of the Fourteenth Amendment and caused his wrongful conviction and the injuries and damages set forth above.

## COUNT II

### 42 U.S.C. § 1983: FOURTEENTH AMENDMENT VIOLATION: SUBSTANTIVE DUE PROCESS

91. Mr. Lowery hereby incorporates by reference all of the foregoing and further alleges as follows:

92. Although defendants Malugani, Johnson, Raynor and unnamed police officers knew or should have known that Mr. Lowery was not involved in the rape of Ms. Kroeplin, they fabricated statements, including admissions attributable to Mr. Lowery, in police reports and in testimony, pretrial and at trial, concerning the precise details of the crime, used coercive interrogation tactics in violation of his Fifth Amendment right to counsel and to be free from compelled self-incrimination, suppressed the exculpatory evidence that they had engaged in such wrongdoing, and failing adequately to investigate the crime to seek out the true perpetrator, disregarded evidence indicating that Mr. Lowery was innocent and evidence pointing to other leads or suspects, as set forth above.

27

93.   These coercive and egregious acts shock the conscience, and/or were reckless and deliberately indifferent, violated Mr. Lowery's clearly established constitutional right to substantive due process of law as guaranteed by the Fourteenth Amendment and caused his wrongful conviction and the injuries and damages set forth above.

## COUNT III

### 42 U.S.C. § 1983 FOURTH AND FOURTEENTH AMENDMENT VIOLATIONS: FALSE ARREST AND MALICIOUS PROSECUTION

94.   Mr. Lowery hereby incorporates by reference all of the foregoing and further alleges as follows:

95.   Defendants Malugani, Johnson, Raynor and unnamed police officers, all state actors, acting deliberately, recklessly and under color of law, falsely arrested and imprisoned Mr. Lowery, without probable cause or other legal justification, knowing that there was no physical or testimonial evidence connecting Mr. Lowery with the crime, and that they had fabricated statements including admissions attributable to Mr. Lowery in police reports and in testimony, pretrial and at trial, concerning the precise details of the crime, and where in fact Mr. Lowery was innocent of any crime.  Thus, there was not even arguable probable cause to arrest or prosecute Mr. Lowery, and no reasonable officer would have believed probable cause existed.

96.   Defendants Malugani, Johnson, Raynor and unnamed police officers, all state actors, acting under color of law, commenced and/or caused to be continued a criminal prosecution against Mr. Lowery that was lacking in probable cause, instituted with malice, by disregarding credible alibi evidence, suppressing exculpatory evidence, fabricating and coercing a false confession, failing adequately to investigate the crime and

28

disregarding evidence indicating that Mr. Lowery was innocent and evidence pointing to other leads or suspects, and the prosecution ultimately terminated in Mr. Lowery's favor, when through DNA testing he was exonerated.

97.   The actions of the defendant police officers violated Mr. Lowery's clearly established rights under the Fourth Amendment and the procedural due process component of the Fourteenth Amendment, caused his wrongful conviction and the injuries and damages set forth above.

**COUNT IV:**

**42 U.S.C. § 1983: SUPERVISORY LIABILITY**

98.   Mr. Lowery hereby incorporates by reference all of the foregoing and further alleges as follows:

99.   Defendants Alvin D. Johnson, Lt. Steve French, and Captain Larry Woodyard and the Richard Roe supervisory police officers, all state actors, acting deliberately, recklessly and under color of law, were, at the relevant times, supervisory personnel with the Riley County Police with oversight responsibility for the training, hiring, screening, instruction, supervision and discipline of Malugani, Johnson, Radnor and John Doe police officer defendants who deprived Mr. Lowery of his constitutional rights.

100..   These supervisory defendants knew or should have known that defendant officers were conducting false arrests and maliciously prosecuting civilians, failing to investigate evidence pointing to other leads or suspects, fabricating and coercing confessions, suppressing exculpatory evidence, and depriving civilians of due process of law.

101. These supervisory defendants were personally involved in failing to take preventative and remedial measures to guard against such constitutional deprivations, such that Mr. Lowery would not have been injured. These supervisors knew or in the exercise of due diligence would have known that the conduct of the named and John Doe defendants against Mr. Lowery was likely to occur.

102. The failure of supervisory defendants to train, screen, supervise and discipline the named individual defendants and John Does amounted to gross negligence, deliberate indifference or intentional misconduct which directly caused the injuries and damages set forth above.

**COUNT V:**

**42 U.S.C. § 1983: MONELL CLAIM**
**UNCONSTITUTIONAL OFFICIAL POLICY AND FAILURE TO SUPERVISE AND**
**TRAIN**

103. Mr. Lowery hereby incorporates by reference all of the foregoing and further alleges as follows:

104. The County of Riley, the Riley County Board of Commissioners, the City of Ogden, the Ogden Board of City Commissioners, the City of Manhattan, the Manhattan Board of City Commissioners the Riley County Law Enforcement Agency and the Riley County Law Enforcement Department, by and through its policymakers, failed to ensure through custom, policy and/or practice that officers would conduct constitutionally adequate investigations; never fabricate inculpatory evidence; obtain probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted; disclose to prosecutors

30

material information favorable to criminal defendants; follow the duties imposed by Brady v. Maryland; and refrain from unconstitutional interrogation techniques.

105.    The County of Riley, the Riley County Board of Commissioners, the City of Ogden, the Ogden Board of City Commissioners, the City of Manhattan, the Manhattan Board of City Commissioners,  the Riley County Law Enforcement Agency and the Riley County Law Enforcement Department, and/or other final policymakers had actual or constructive notice of such failures to train, supervise and provide policy to its employees, and failed to provide training or supervision despite an obvious need that such training and supervision was required, where Defendants knew that it was foreseeable that officers would predictably confront these situations and as a result of the failure to train and supervise, constitutional violations would result.

106.    The County of Riley, the Riley County Board of Commissioners, the City of Ogden, the Ogden Board of City Commissioners, the City of Manhattan, the Manhattan Board of City Commissioners the Riley County Law Enforcement Agency and the Riley County Law Enforcement Department, by and through their final policymakers, failed to adequately screen or discipline its employees, though it was foreseeable that constitutional violations of the type Mr. Lowery suffered would be a predictable result of such failures.

107.    The County of Riley, the Riley County Board of Commissioners, the City of Ogden, the Ogden Board of City Commissioners, the City of Manhattan, the Manhattan Board of City Commissioners the Riley County Law Enforcement Agency and the Riley County Law Enforcement Department, by and through their final policymakers, had in force and

31

effect at the time of the conduct complained of, a policy, practice or custom of conducting constitutionally inadequate investigations; fabricating inculpatory evidence; failing to obtaining probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted; suppressing from prosecutors material information favorable to criminal defendants; failing to follow the duties imposed by <u>Brady v. Maryland</u>; and using unconstitutional interrogation techniques.

108.   Such failures to supervise, train, discipline, and screen, and such unconstitutional municipal customs, practices and/or policies, amounted to gross negligence, deliberate indifference or intentional misconduct, and were the moving force behind plaintiff's arrest, prosecution, and incarceration, and proximately and directly caused the injuries and damages set forth above.

## COUNT VI

### 42 U.S.C. § 1983: CIVIL CONSPIRACY TO VIOLATE CONSTITUTIONAL RIGHTS AGAINST ALL NAMED AND UNNAMED INDIVIDUAL DEFENDANTS

109.   Mr. Lowery hereby incorporates by reference all of the foregoing and further alleges as follows:

110.   The defendant officers, under color of law, entered an unlawful agreement with one another for the purpose of depriving Mr. Lowery of his constitutional rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution and the right to due process of law and fair trial.

111.   In furtherance of the conspiracy, each defendant committed overt acts where they deprived him of procedural and substantive due process by deliberately or recklessly fabricating evidence, failing to investigate and suppressing exculpatory evidence,

employing coercion, and they falsely arrested and maliciously prosecuted Mr. Lowery; all conduct that resulted in prejudice to plaintiff.

112.   These acts caused Mr. Lowery to suffer the injuries and damages set forth above.

## COUNT VII

## § 1983 AND PENDANT LOSS OF ASSOCIATION CLAIM BY PLAINTIFFS AGAINST ALL DEFENDANTS

113.   Plaintiffs incorporate fully all of the foregoing as if set forth herein and further allege: Defendants' conduct undermined Amanda Marie Lowery's First and Fourteenth Amendment and state law liberty interest in preserving the integrity and stability of the family relationship from intervention by the state without due process of law.

114.   These acts caused Plaintiff Amanda Marie Lowery to suffer the damages set forth above.

## STATE LAW CAUSES OF ACTION

## COUNT VIII

## MALICIOUS PROSECUTION

115.   Mr. Lowery hereby incorporates by reference all of the foregoing and further alleges as follows:

116.   Defendant police officers Malugani, Johnson, Raynor and John Doe officers initiated, continued or procured criminal proceedings against Mr. Lowery, without probable cause, with malice or specific intent to injure, and the proceedings ultimately terminated in plaintiffs' favor.

117.   As a result of this malicious prosecution, Mr. Lowery sustained the injuries and damages set forth above.

## COUNT IX

33

## FALSE ARREST

118.   Mr. Lowery hereby incorporates by reference all of the foregoing and further alleges as

follows:

119.   Mr. Lowery was unlawfully arrested by defendant officers Malugani, Johnson, Raynor

and John Doe police officers, who took an active role, assisting, directing, or encouraging

that arrest, without probable cause, and where no evidence connected Mr. Lowery to a

crime aside from the confession fabricated and coerced by defendant officers.

120.   As a direct and proximate result, plaintiff suffered the injuries and damages set forth

above.

## COUNT X

## ABUSE OF PROCESS

121.   Mr. Lowery hereby incorporates by reference all of the foregoing and further alleges as

follows:

122.   Defendant police officers Malugani, Johnson, Raynor and John Doe officers made an

illegal, improper, and/or perverted use of a lawfully initiated legal process which was

neither warranted nor authorized by the process, with an ulterior motive or purpose, when

they obtained an arrest and conviction of Mr. Lowery by use of a fabricated and coerced

confession.

123.   As a direct and proximate result of this abuse of process, Mr. Lowery sustained the

injuries and damages set forth above.

## COUNT XI

## FALSE IMPRISONMENT

124.   Mr. Lowery hereby incorporates by reference all of the foregoing and further alleges as
follows:

125.   Defendant police officers Malugani, Johnson, Raynor and John Doe officers falsely
imprisoned Mr. Lowery by restraining him without legal cause, against his will and by
using words or acts which the person being restrained is too afraid to disregard, in the
course of refusing him access to counsel, and coercing him to repeat facts fed to him and
confess to a crime he did not commit.

126.   As a direct and proximate result of this false imprisonment, Mr. Lowery sustained the
injuries and damages set forth above.

## COUNT XII

### NEGLIGENT TRAINING, SUPERVISION AND ADOPTION OF POLICIES

127.   Mr. Lowery hereby incorporates by reference all of the foregoing and further alleges as
follows:

128.   The County of Riley, the Riley County Board of Commissioners, the City of Ogden, the
Ogden Board of City Commissioners, the City of Manhattan, the Manhattan Board of
City Commissioners the Riley County Law Enforcement Agency and the Riley County
Law Enforcement Department, and/or Riley County police policymakers, Alvan D.
Johnson, Lt. Steve French, and Larry Woodyard the Richard Roe supervisory officers had
a duty to properly train, supervise and provide adequate policies to prevent the above
conduct, including fabrication of evidence, coercing a confession and suppressing
exculpatory evidence, and negligently failed to provide such training, supervision and
policies.

35

129.   As a direct and proximate result of this negligent training, supervision and adoption of policies, Mr. Lowery sustained the injuries and damages set forth above.

## COUNT XIII

### NEGLIGENCE

130.   Mr. Lowery hereby incorporates by reference all of the foregoing and further alleges as follows:

131.   Defendant police officers Malugani, Johnson, Raynor and John Doe officers owed a duty to plaintiff, and breached that duty, by engaging in conduct including fabricating and coercing a confession to a crime Mr. Lowery did not commit, failure to investigate, suppressing exculpatory evidence, false arrest, and malicious prosecution.

132.   As a direct and proximate result, plaintiff suffered the injuries and damages set forth above.

## COUNT XIV

### NEGLIGENT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

133.   Mr. Lowery hereby incorporates by reference all of the foregoing and further alleges as follows:

134.   Defendant police officers Malugani, Johnson, Raynor and John Doe officers acted with intentional or in reckless disregard of Mr. Lowery, or with negligence, and their conduct in fabricating and coercing a confession to a crime Mr. Lowery did not commit, was extreme and outrageous and/or willful or wanton.

36

135.   As a direct and proximate result, plaintiff suffered extreme and severe mental distress that no reasonable person should be expected to endure, and the immediate physical injuries and other injuries and damages set forth above.

## COUNT XV

### KANSAS TORT CLAIMS ACT

136.   Mr. Lowery hereby incorporates by reference all of the foregoing and further alleges as follows:

137.   Defendants the County of Riley, the Riley County Board of Commissioners, the City of Ogden, the Ogden Board of City Commissioners, the City of Manhattan, the Manhattan Board of City Commissioners are liable under the Kansas Tort Claims Act K.S.A. 75-6103(a) for damages caused by acts or omissions of employees acting within the scope of their duties who have committed negligent or wrongful acts or omissions, by improperly coercing a confession, fabricating evidence, suppressing material exculpatory evidence.

138.   As a direct and proximate result, plaintiff suffered the injuries and damages set forth above

139.   **WHEREFORE**, EDDIE JAMES LOWERY and AMANDA MARIE LOWERY prays as follows:

A.   That the Court enter judgment in favor of Mr. LOWERY and Ms. LOWERY and against defendants on all Counts of the Complaint;

B.   That the Court award compensatory damages to Mr. LOWERY and Ms. LOWERY and against the defendants, jointly and severally, in an amount to be determined at trial;

37

C.     That the Court award punitive damages to Mr. LOWERY and Ms. LOWERY AND against defendants, jointly and severally, in an amount to be determined at trial, in order that such award will deter similar proscribed conduct by defendants in the future;

D.     That the Court award to Mr. LOWERY and Ms. LOWERY AND against defendants pre-judgment and post-judgment interest on all sums awarded them in this action and that it further award Mr. LOWERY and Ms. LOWERY recovery of their costs concerning this action, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

E.     That the Court grant Mr. LOWERY and Ms. LOWERY any such other relief to which they may be entitled.

## PLAINTIFF DEMANDS TRIAL BY JURY

Plaintiff requests a trial by jury.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates Kansas City, Kansas, as the location for the trial in this matter.

Dated: October 21, 2004          Respectfully submitted,

EDDIE LOWERY

By:

s/ Barry A. Clark
BARRY A. CLARK
Ks. Sup. Ct. #13083

38

Attorney for Plaintiff
CLARK & KELLSTROM, CHTD.
417 Poyntz Avenue
Manhattan, KS 66502
Tel. (785) 539-6634
Fax. (785) 539-2617
E-mail  bclark@kansas.cc


s/ Nick Brustin
COCHRAN NEUFELD & SCHECK
LLP
Barry C. Scheck, Esq. (#4612)
Nick Brustin, Esq. (#0605)
99 Hudson St., 8th Floor
New York, NY 10013
Tel. (212) 965-9081
Fax. (212) 965-9084
E-mail nick@cnscivilrights.com