**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

EDDIE JAMES LOWERY, and )
AMANDA MARIE LOWERY, )
                 )
           Plaintiffs, )
                 )
v.                     )     Case No. 04-3101-DWB
                 )
THE COUNTY OF RILEY, et al., )
                 )
          Defendants, )
_____ )

## MEMORANDUM AND ORDER

Presently before the Court are the following crossclaims:

1.     Crossclaim of Farmers Alliance Mutual Insurance Company (FAMI) against the City/County Defendants (Doc. 291); and

2.     Crossclaim of City of Ogden, City of Manhattan, and Board of County Commissioners of the County of Riley, Kansas (City/County Defendants) against FAMI. (Doc. 292.)

I.     <u>PROCEDURAL BACKGROUND.</u>

These crossclaims arise out of a court-ordered mediation held in this case.

The Court (both the undersigned magistrate judge and the assigned district judge)

entered orders directing mediation of this case and further directing that certain

insurers, including FAMI, attend a  mediation conference to be conducted by

Dennis Gillen on November 12, 2009.  (Doc. 265, 266.)  The mediation was held

and an Alternative Dispute Resolution Report was filed on December 12, 2009, which indicated that the case had settled at the ADR session, but also stated that the session lasted over eight hours in person with "3 weeks of follow up discussion." (Doc. 275.)

A disagreement arose after the mediation concerning whether FAMI had offered to contribute funds to the proposed settlement. The City/County Defendants filed a motion to enforce the settlement (Doc. 277), and FAMI filed a motion to intervene. (Doc. 278.) The Court granted FAMI's motion to intervene, but determined that the matter should proceed by means of crossclaims rather than by motions, and directed the filing of such crossclaims. (Doc. 289.) On May 18, 2010, after the parties had filed their respective crossclaims, the Court held a pre-hearing conference concerning the crossclaims and entered a Pre-Hearing Order. (Doc. 296.)

A bench trial of these claims was held on June 9, 2010 before the undersigned magistrate judge.[1] (Doc. 298.) The City/County Defendants appeared through counsel David R. Cooper and Teresa L. Watson; FAMI appeared through counsel Timothy J. Finnerty and Brian G. Boos. The parties stipulated to the

---

[1] The parties to these crossclaims consented to have them heard by a magistrate judge. (Doc. 288.)

admission of the following exhibits:

> Exhibit 1 (RCMO 1-37);
>
> Exhibit 2 (FAMI 1-837);
>
> Exhibit 3 (Gillen 1-50).

The City/County Defendants called three witnesses: Dennis Gillen,[2] Bill Beck, and Ian Hale. These witnesses all appeared pursuant to subpoenas. (Doc. 294, 295.) FAMI called two witnesses: Sandy Baldwin and Jess Arbuckle.

After the bench trial, the parties filed proposed findings of fact and conclusions of law. (Doc. 299, 300.)

Having reviewed the pleadings, suggested findings and trial exhibits, the Court is prepared to rule.

II.  STIPULATED AND DISPUTED FACTS.

A.  *Stipulated Facts.*

As set out in the Pre-Hearing Order, the parties have stipulated to the following facts:

1. Farmers Alliance Mutual Insurance Company ("FAMI") is an insurance

---

[2] Mr. Gillen, as the mediator, testified pursuant to an order of the Court and pursuant to the provisions of D. Kan. Rule 16.3. The Court finds that the mediator's testimony is necessary in this case in order to prevent manifest injustice, D. Kan. Rule 16.3(i)(3)(A), and because his testimony involves disclosures stipulated by all parties and disclosures of an agreement, or alleged agreement, in a proceeding to determine the existence of a binding settlement contract. D. Kan. Rule 16.3(j)(1) & (2).

company authorized to conduct business in Kansas.

2. Plaintiff Eddie Lowery ("Lowery") has alleged in this ease that defendants Riley County, City of Manhattan, and City of Ogden, among others, are or may be liable for damages arising from Lowery's alleged wrongful arrest, conviction, and incarceration, all as more fully described in Lowery's 2004 Complaint. (Doc. 1).

3. FAMI issued to City of Ogden policy #003-GL 149295 (the "Policy") for the period May 6, 1981 to May 6, 1982, subject to its declarations, coverage limits, insuring agreement, endorsements, exclusions, and other terms and conditions therein contained.

4. Venue is proper pursuant to 28 U.S.C. § 1391 (b).

5. City of Ogden ("Ogden") notified FAMI of Lowery's lawsuit in December 2005, and demanded that FAMI defend and indemnify it against Lowery's claims under the Policy.

6. FAMI subsequently sent Ogden a reservation of rights letter in which it denied that the Policy provides coverage for Lowery's claims and further denied that FAMI owes Ogden any duty to defend or indemnify it against Lowery's claims.

7. The Court, on September 17, 2009, ordered the parties and their

respective insurers to appear at November 12, 2009 mediation. (Doc. 265).

8. FAMI appeared at the mediation by Jess W. Arbuckle and Sandy Baldwin.

9. The parties and insurers participating in the mediated settlement of the case have executed a written settlement agreement and release of claims consistent with promises made during and after the mediation on November 12, 2009. (Said Settlement Agreement is attached as Exhibit B to Doc. 277)

10. The City of Ogden executed the settlement agreement on January 20, 2010.

11. More than five days have passed since January 20, 2010.

12. The City/County Defendants, through counsel, have made demand upon FAMI to pay $100,000 toward the settlement pursuant to it oral agreement at mediation to do so. FAMI has not done so and avers that it made no oral agreement at mediation to pay $100,000 toward settlement and disputes any obligation to do so. (Doc. 296, at 3-4.)

### B. Disputed Facts and Positions of the Parties.

The dispute concerning FAMI's position at the November 12, 2009 mediation arises out of only two short meetings: the first between FAMI representatives (Baldwin and Arbuckle) and two attorneys representing Lowery

(Beck and Hale); the second between FAMI representatives (Baldwin and

Arbuckle) and the mediator (Gillen). Neither meeting is reported to have lasted

more than 5-10 minutes. Recollections of the participants of these meetings are

diametrically opposed as to major points.

     1.     The First Meeting.

The mediation began with a opening presentation by Plaintiff's attorneys

about the nature of Plaintiff's claims and damages. Attendees then broke up and

went to separate rooms waiting to meet with the mediator. The first meeting

between Baldwin, Arbuckle, Beck and Hale occurred late in the morning when

Beck and Hale came into the room assigned to FAMI. None of these four

individuals knew each other, and both were sides were initially uncertain who they

were dealing with and why. Baldwin and Arbuckle recall reviewing with Beck and

Hale FAMI's position on coverage and the policy limits of the policy issued by

FAMI to the City of Ogden ($100,000 vs. $500,000). FAMI had not been able to

locate a copy of the policy, and prior to the mediation FAMI had spent time

attempting to reconstruct the contents of that policy. FAMI had previously sent the

City of Ogden a reservation of rights letter written by a coverage attorney which

outlined FAMI's position that they had no coverage because they could not find

that any personal injury endorsement had been purchased and without such an

endorsement, the policy would allegedly not cover any claims made by Lowery against the City of Ogden. In any event, even if there was coverage, FAMI's research indicated that the policy limits were $100,000, not the $500,000 believed by Plaintiff's attorneys. FAMI is adamant that they made no statements to Beck and Hale that constituted any offer to contribute to a settlement with Plaintiff. Arbuckle stated that he would never have made any offer to representatives of Plaintiff because it is his policy during mediations to only make offers directly to the mediator. FAMI recalls only stating as Beck and Hale left that they (Plaintiff's representatives) had a long way to go. In retrospect, Arbuckle stated that what this really meant to him was not that there was a long way to go to reach a settlement, but rather that Plaintiff had a long way to go before Plaintiff could reach FAMI's pocketbook.

Beck and Hale agree that during the meeting with Baldwin and Arbuckle they reviewed documents provided by FAMI concerning the reconstruction of the FAMI policy to the City of Ogden specifically concerning the applicable policy limits, but do not recall any significant discussion of the coverage issue. Hale does recall that before coming to the mediation he saw a copy of FAMI's reservation of rights letter which dealt with the personal injury endorsement and coverage issue. After listening to FAMI and reviewing their documents, Beck became persuaded

that the FAMI policy limits were more likely the $100,000 figure, not $500,000.

Beck testified that it was his preference to reach a global settlement of all claims with all parties, but that he was prepared to "carve out" any party who did not participate for later litigation concerning their policy obligations. Beck gave his argument that Plaintiff had a strong case and that FAMI should simply pay its policy limits in order to avoid being "carved out" of any settlement and left with the risk that FAMI could be found to have failed to settle within policy limits thus risking a later judgment for a much greater amount than their policy limits. Beck testified that Arbuckle told him if FAMI's $100,000 would help him get the case settled, Beck had it, but he believed there was a long way to go. Beck believed that FAMI had given him "an option" on FAMI's policy limits of $100,000 to use in order to put together a settlement. The only condition precedent to that option was to obtain a settlement and order of dismissal of the parties who were insured. As he was leaving and was told that there was a long way to go, Beck believed that this referred to Plaintiff's ability to reach an overall or global settlement with all the parties. In response, Beck said that a journey of a thousand miles begins with a single step. At some time later, Beck met with Gillen and talked about his discussions with FAMI and with other carriers.

        2.    <u>The Second Meeting.</u>

Arbuckle testified that he attended the mediation because he didn't want FAMI to be told to just pay the money (i.e., policy limits) since he knew that is how the game works, and he did not want to pay the $100,000 on this claim. After talking with his coverage attorney, Arbuckle was told that he could "still go hard" with every argument made in the reservation of rights letter his coverage counsel had sent to the City of Ogden several years before the mediation. When he and Baldwin signed in at the mediation, Arbuckle identified himself as a FAMI representative and then wrote "no coverage" on the sign-in sheet. *See* Exhibit 3, at 47.

The second meeting took place after lunch between Baldwin, Arbuckle and Gillen. Arbuckle and Gillen had worked on other cases and mediations in the past and Arbuckle described Gillen as a friend, so the discussions were very friendly. Arbuckle testified that Gillen asked FAMI's position and Arbuckle replied that if they had coverage it was $100,000, but there was no coverage because there was no personal injury endorsement, and he showed Gillen the documents about the policy that he had earlier discussed with Beck and Hale. Arbuckle went on to say, however, that Gillen knew Arbuckle and he (Arbuckle) was not going to set here with his hands crossed all day and say zero like some other carriers were apparently doing. Arbuckle said FAMI would like to be included in any settlement

and if he could throw in a bit of money to help get it settled he would do so. Arbuckle testified that Gillen asked if FAMI was going to let the case go to trial for $100,000, and Arbuckle responded that he did not know about that but there was a long way to go until that happens. Arbuckle said that the only time he used the $100,000 figure was in connection with the coverage amount and he saw Gillen write that down somewhere in his notes.

Baldwin apparently did not talk much during the meeting but in her trial testimony she confirmed Arbuckle's statements.

Gillen testified that when he came into the meeting with FAMI he asked how much coverage FAMI had because he was uncertain whether the policy limits were $500,000 or $100,000. After determining the coverage was $100,000, Gillen told Arbuckle that he needed "to pony up" his limits because otherwise he would be carved out of the settlement and the defense costs would eat up his policy limits. Gillen testified that Arbuckle nodded his head at this statement, and there was no doubt in Gillen's mind that Arbuckle had manifested an intention to contribute $100,000 from FAMI to settle the case. Gillen thereafter included the sum of $100,000 in his notes as a contribution by FAMI. Gillen's practice on note-taking was to put an asterisk or similar notation by any amounts that were discussed but that were not certain. Gillen's notes did not contain any asterisk or other

qualifying note concerning the $100,000 from FAMI. *See* Exhibit 3 at 11, 19, 21 & 22.

### 3. Events After November 12, 2009.

No settlement was reached during the mediation on November 12, 2009. Arbuckle visited briefly with Gillen as the mediation was winding up and Gillen told him no settlement had been reached and if Gillen needed anything further he would contact them. Arbuckle asked if Gillen thought the case was going to settle, and Gillen said he thought it would settle in the $6 to $10 million dollar range. Arbuckle's impression was that if Gillen need a little more money, he would call Arbuckle.

When the November 12 mediation concluded, there was a pool of money available from defendants or carriers of defendants in the amount of $6,200,000. Exhibit 1, at 1; Exhibit 3, at 19. Thereafter, the parties continued discussions, mainly between plaintiff and the defendants or carriers who had not made offers during the mediation. Gillen, as mediator, was not deeply involved in those discussions. Ultimately, Gillen was advised by Plaintiff's representative, apparently Beck, that the case settled for $7,500,000 on December 7, 2009. Thereafter Hale worked on a draft of a proposed settlement agreement but he did not know precisely which parties were contributing what amounts so no dollar

amounts were included.  This draft was sent to FAMI's coverage attorney for review.

Gillen had not disclosed to Plaintiff's representatives precisely who was contributing what dollar amounts because some of the defendants had asked him not to disclose this information.  As the parties were finalizing the settlement documents, they could not get the numbers to add up and Gillen was contacted.  After hearing who was shown as contributing what amounts, Gillen noted that FAMI had not been included and their amount was $100,000.  When this was relayed to FAMI's representatives, they immediately denied making any such offer and contact was initiated with Gillen to find out the situation.  Arbuckle and Gillen had two telephone conversations about this "misunderstanding."  The participants' recollections of the substance of these telephone conversations vary.

Arbuckle testified that he called Gillen on January 5, 2010, and pinned him down to the fact that Arbuckle had never said that Gillen had FAMI's $100,000.  Arbuckle then proceeded to see if he could negotiate a resolution of this misunderstanding directly with the parties by contacting Ogden's counsel.

As to this first telephone call, Gillen testified that Arbuckle said that he had had a discussion with Ogden's counsel that did not go well where FAMI offered to pay $10,000.  Gillen made notes of this conversation.  *See* Exhibit 3, at 3.  Gillen

testified that Arbuckle did not dispute that he said that he might have to pay the $100,000, but claimed that he never formally tendered the $100,000. Arbuckle said no one formally asked him or used the "magic words." Gillen disagreed and told Arbuckle that Gillen thought Arbuckle had tendered that amount even though Arbuckle may not have used the "magic words," and Gillen stated that there was no doubt in his mind that Arbuckle agreed to pay the $100,000 because he didn't have a choice.

A second telephone call between Arbuckle and Gillen took place on approximately January 8, 2010 when Gillen returned a call from Arbuckle. Gillen had been dictating a letter on another matter and he left his recorder on during his call with Arbuckle. The recorder picked up only Gillen's side of the conversation. That recording was later transcribed and reviewed by Gillen in a memo to the file. *See* Exhibit 3, at 1-2. The portion of the memo in quotation marks on page 1 and the top of page 2 is a direct transcription of the recording. The last paragraph on page 2 was a summary which was dictated by Gillen as soon as he hung up from talking with Arbuckle. These quotes and later dictated notes are substantially the same as the first call – that Gillen understood that Arbuckle had tendered his $100,000 policy limits even if he did not formally use "magic words." In the dictated portion, Gillen noted that Arbuckle did not dispute that he had told Gillen

he would pay the $100,000 to settle the case if he had to, but no one asked him and he never used those words to tell Gillen he would pay policy limits although he knew he would have to. *See* Exhibit 3, at 2.

As to the second conversation, Arbuckle testified that he had not seen Gillen's notes, Exhibit 1, at 1-2, prior to the day of trial. He stated that he did not recall that conversation verbatim, but disputes that he ever stated that he would pay the $100,000 if he had to in order to get the case settled.

When the dispute concerning FAMI's role in the mediation could not be resolved, FAMI refused to contribute $100,000 to the settlement. The final settlement agreement provided that any settling defendant or insurer could agree to advance the additional $100,000 allegedly due from FAMI, and the City of Ogden would assign to such party or parties its rights to seek enforcement of the settlement agreement. The additional $100,000 was subsequently advanced by two City/County Defendants: the City of Manhattan, Kansas paid $80,000 and Riley County paid $20,000. These crossclaims followed.

III.    COURT'S FINDINGS OF FACT.

The Court's job in making findings of fact after hearing conflicting live testimony at trial involves a determination of credibility of the witnesses. Here, the Court was presented with conflicting evidence from several witnesses, holding three

different positions: representatives of FAMI, representatives of Plaintiff Lowrey, and the mediator. The Court does not doubt that all of these witnesses honestly believe the substance of their testimony accurately reflects the events that occurred. Each witness tells his/her story based on his/her special position and recollection. In deciding which version to accept, the Court must first of all take into account the unique position from which each witness has viewed this transaction.

Starting with the first meeting during the mediation on November 12, 2009 between Plaintiff Lowrey's representatives (Beck and Hale) and FAMI representatives (Arbuckle and Baldwin), the Court cannot find that FAMI representatives made any $100,000 offer of settlement to Beck and Hale. Considering that none of the four participants (Arbuckle, Baldwin, Beck and Hale) in the first conversation on November 12 knew each other, and crediting Arbuckle's statement that he never makes offers during mediations to anyone other than the mediator, the Court concludes that while Beck and Hale may have had the impression that FAMI was giving them an "option" on the FAMI $100,000 policy limits, there was no offer made by Arbuckle or Baldwin. The Court agrees with Beck that because of the small policy limits of FAMI's policy with the City of Ogden, it would be unreasonable, and therefore also unlikely, that a small insurer would risk being carved out of the settlement without offering to settle the case.

That fact alone, however, does not lead to the conclusion that FAMI made a policy limits offer to Beck and Hale.

The situation concerning the second meeting, however, presents a different situation. The Court first considers the events of that meeting from FAMI's perspective. Acknowledging FAMI's earlier reservation of rights letter, the fact that FAMI had refused to participate in an earlier mediation of the case and FAMI's note in the sign-in sheet that they had "no coverage," could all reasonably lead one to believe that FAMI had decided to "still go hard" with the arguments it made in its reservation of rights letter. This would also be consistent with Arbuckle's statement that he was attending in order to prevent FAMI from being told to simply pay its policy limits, and statements by FAMI representatives that the coverage issue was as important to them as the determination of the policy limits. The suggestion that FAMI was taking a hard position on coverage, however, is not supported by testimony of either the Plaintiff's representatives or the mediator.

While the Court has not accepted Beck's impression that he had an "option" on FAMI's policy limits, it does find persuasive Beck's and Hale's statements that their short meeting with FAMI did not focus on the lack of coverage due to the absence of a personal injury indorsement to the policy. While that might have been part of the review by FAMI of the documents it had gathered concerning the

missing policy, its importance apparently was not stressed by FAMI to the extent they would have the Court believe.

This is also the tenor of the testimony of the mediator. Gillen is an experienced mediator, having conducted between 1700 and 1800 mediations during his almost thirty years acting as a mediator. The Court finds that this extensive experience, coupled with Gillen's stated procedure for note-taking concerning the positions and offers of participants in a mediation, makes his testimony very persuasive. Moreover, unlike representatives of either Lowrey or FAMI, he was a neutral party during the mediation in this case with no stake in the outcome of the mediation and no stake in the outcome of the present disputes. This makes his testimony much stronger and more believable. There was no indication that FAMI had provided the mediator with any written pre-mediation statement of FAMI'S coverage position and there was no evidence that the mediator had seen a copy of the earlier reservation of rights letter setting out the grounds for FAMI's contention that it had no coverage. While all the carriers were generally questioning coverage, those arguments did not seem particularly forceful or persuasive to the mediator, particularly as to FAMI's policy, which covered the critical time period in the case when Lowrey had been arrested and convicted.

The mediator explained his normal procedure for taking notes during a

mediation and none of his notes indicate any serious discussion of coverage issues by FAMI nor do his notes indicate any uncertainty about the mediator's understanding of FAMI's offer. There is also nothing to indicate that FAMI was "laying in the weeds" to see how the settlement progressed before making any offer. Gillen testified that had such a mediation posture been disclosed to him by FAMI, he would have made a note about it in his mediation notes. While there is a separate note about the policy limits of the FAMI policy being $100,000 (versus the $500,000 noted by Plaintiff's pre-mediation statement), the Court does not accept the argument that the mediator confused the policy limits with an offer to settle. The Court finds that the mediator stated to Arbuckle that FAMI needed to "pony up" its $100,000, and that Arbuckle nodded an agreement to that statement.

This finding is further supported by recorded portion of the second telephone call and the notes of the mediator taken during the two subsequent telephone conversations with Arbuckle after the dispute over FAMI's participation in the settlement had surfaced. Those notes, although contested at trial by Arbuckle, clearly state that Arbuckle didn't dispute that he said to the mediator that he knew he would have to pay the $100,000. In fact, both Baldwin and Arbuckle stated at trial that they had come to the mediation with authority to pay the $100,000 without having to check with anyone else at the company.

Therefore, having heard all the testimony and reviewed the exhibits,[3] the Court finds by a preponderance of the evidence that FAMI, acting through its authorized representatives, did offer to the mediator the full policy limits of the policy issued to the City of Ogden in the amount of $100,000 to be used to attempt a global settlement with Plaintiff Lowrey. As a result, there was nothing further that the mediator needed from FAMI and any further communications would only be to advise if a settlement had been reached or not. Furthermore, the Court does not find that the later confusion as to the amount of FAMI's contribution to the settlement which arose during the drafting of the settlement agreement supports a finding that FAMI never made a $100,000 offer of settlement. Finally, the Court finds that FAMI never revoked or withdrew its settlement offer prior to acceptance by the Plaintiff.

## IV.   CONCLUSIONS OF LAW.

### A.   *The Contract Issue.*

A trial court has the power to summarily enforce a settlement agreement between the parties to a case which is still pending in that court. ***United States v. Hardage,*** 982 F.2d 1491, 1496 (10th Cir. 1993); ***Shoels v. Klebold,*** 375 F.3d 1054,

---

[3] While there are over 900 pages of exhibits which were admitted without any objection, relatively few of those were actually discussed by the witnesses at trial.

1060 (10th Cir. 2004).  The law favors agreements to compromise and settle disputes, and absent bad faith or fraud, parties who have entered into a settlement agreement will not be allowed to repudiate it.  *See **Advantage Properties,*** 2000 WL 1694071 at * 2, *citing **Ferguson v. Schneider Nat'l Carriers, Inc.,*** 826 F.Supp. 398, 400 (D. Kan. 1993).

The question of whether there is a binding settlement agreement may be governed by state contract law, *see **Advantage Properties, Inc. v. Commerce Bank, N.A.,*** 242 F.3d 387, 2000 WL 1694071 at * 2 (10th Cir. 2000) (Table) *citing **Central Kan. Credit Union v. Mutual Guar. Corp.,*** 886 F.Supp. 1529, 1537 n. 2 (D. Kan. 1993), *aff'd* 102 F.3d 1097 (10th Cir. 1996), or federal law, *see **Swift-Eckrich, Inc.,*** 55 F.Supp.2d 1280, 1284 (D. Kan. 1999).  However, this issue is often immaterial because it does not appear there is any substantial difference in the standards to be applied under Kansas law or federal law.  In this case, the parties have stipulated that the crossclaims are governed by Kansas law, and the Court agrees.

Settlement agreements need not be in writing to be enforceable under Kansas law.  Lewis v. Gilbert, 14 Kan. App.2d 201, 203, 785 P.2d 1367 (1990).  In order for the parties to form a binding contract, there must be a meeting of the minds as to all essential terms.  Augusta Bank & Trust v. Broomfield, 231 Kan. 52, 60, 643 P.2d 100 (1982).  *See also* Watson v. Marinovich, No. 98-2380-KHV, 1999 WL

450950, * 2 (D. Kan. Jun. 22, 1999) *citing* Albers v. Nelson, 248 Kan.575, 580, 809

P.2d 1194, 1198 (1991).  Where the evidence concerning the existence of a contract

is conflicting, this raises a factual issue for determination by the trier of fact,[4] and

the controlling question whether a binding contract was entered into depends on the

intention of the parties, which is also a question of fact.  Sidwell Oil & Gas Co. v.

Loyd, 230 Kan. 77, 83, 630 P.2d 1107 (1981).

> In determining intent to form a contract, the test is
> objective, rather than subjective, meaning that the relevant
> inquiry is the "manifestation of a party's intention, rather
> than the actual or real intention."  17A Am.Jur.2d,
> Contracts § 27.  Put another way, "the inquiry will focus
> not on the question of whether the subjective minds of the
> parties have met, but on whether their outward expression
> of assent is sufficient to form a contract."  1 Lord,
> Williston on Contracts § 4.1, p. 241 (1990).

Southwest & Assoc., Inc. v. Steven Enterprises, 32 Kan. App. 2d 778, 781, 88 P.3d

1246 (2004).[5]

_____

[4] Whether an evidentiary hearing is required to resolve material facts concerning
the existence or terms of a settlement agreement must be determined on a case-by-case
basis. ***Johnson v. Landmark Plaza, Ltd.,*** 16 F.3d 416, 1994 WL 36773 at * 1 (10th Cir.
1994) (Table).  Here the Court has held a full evidentiary hearing and has made findings
of fact after hearing live testimony of the witnesses and examination of the exhibits.

[5] The court notes that the citations in this case to Am.Jur.2d and WILLISTON ON
CONTACTS were to earlier editions of those works.  The referenced citations as found in
the current editions of those works appear to be as follows: 17A Am.Jur.2d, Contracts §
31, pp. 66-67 (2004); 1 LORD, WILLISTON ON CONTRACTS § 4.1, p. 336 (2007).

While the present case involves another element -- the presence of a third-party neutral -- this does not alter the application of the above legal standards. Thus, in determining whether a party has either made an offer or accepted an offer during a mediation, the court is to apply the objective test rather than look to any subjective beliefs of the parties. "The court's inquiry in determining whether a contract exists is whether a reasonable person would, based upon the objective manifestation of assent and all the surrounding circumstances, conclude that the parties intended to be bound by the contract." 17A Am.Jur.2d, Contracts § 31, p. 67 (2004) (footnote omitted).

FAMI's representative argued that FAMI had not made an offer because he did not use "the magic words." This argument completely misses the point. First, there are no magic words that must be uttered in order to constitute either an offer or an acceptance sufficient to create a binding contract. In addition, objective manifestation of assent need not be expressed in words.

> [C]onsistent with the notion that assent is to be judged objectively, the modern law properly construes both acts and words as having the meaning which a reasonable person present when they are undertaken or spoken would ascribe to them in view of the surrounding circumstances. . . . Even when words are used, the contract of the parties will ordinarily be held to embrace not only what they have said, but also what is necessarily implied from what they said. And, broadly speaking, any conduct of one party, from which the other may reasonably draw the inference

of a promise, is effective in law as a promise.

1 LORD, WILLISTON ON CONTRACTS § 4.2, pp. 340-46 (2007) (footnotes omitted).

*See also*, 17A Am.Jur.2d, Contracts § 33, pp. 68-69 (2004) ("Thus, the question of whether a contract has been made must be determined from a consideration of the expressed or manifested intention of the parties -- that is, from a consideration of their words and acts.") (footnotes omitted). Here, the mediator told FAMI that it needed to "pony up" the $100,000 policy limits, and FAMI's representative nodded his assent. Considering the circumstances, this conduct was sufficient to manifest FAMI's assent to the mediator to use FAMI's funds in order to attempt to reach a global settlement of the case.[6] Therefore, considering all of the circumstances and viewed objectively, FAMI made an offer of settlement to the mediator which was never withdrawn prior to Plaintiff's acceptance of a global settlement from all participating parties.

### B.    *The Sanction Issue.*

The City/County Defendants have included in their crossclaim against FAMI a request for sanctions and attorneys fees pursuant to 28 U.S.C. § 1927, claiming

---

[6] As previously noted in the findings of fact, this manifestation of intent was reiterated in later statements made by FAMI's representative in subsequent phone calls with the mediator where the representative stated that he did not dispute that he told the mediator that he knew he would have to pay the $100,000.

that FAMI's actions have unreasonably multiplied the proceedings. (Doc. 292, at 6.) Section 1927 of 28 U.S.C. states:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof, who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorneys' fees reasonable incurred because of such conduct.

When the City/County Defendants began their quest for enforcement of an oral settlement agreement, they sought these sanctions but did not state precisely from whom they were seeking the sanctions. *See e.g.*, Doc. 277, at 9; Doc. 292, at 6. In their Proposed Findings of Fact and Conclusions of Law, these defendants finally specifically propose that they are entitled to recover excess costs, expenses and attorneys' fees " from FAMI and Arbuckle under the authority of 18 U.S.C. § 1927 and the Court's inherent power to control the conduct of litigation." (Doc. 299, at 14 ¶ 29.)

The Court agrees that the controlling authority in this Circuit concerning an award of fees and expenses under 28 U.S.C. § 1927 is Hamilton v. Boise Cascade Exp., 519 F.3d 1197 (10th Cir. 2008). The Court also agrees that Hamilton stands for the proposition that such fees can be awarded in situations involving actions to enforce a settlement agreement. The problem, however, is that this statute provides

only for an award of fees against an attorney. Therefore, neither the statute, nor Hamilton's interpretation of the statute, provide a basis for an award of fees and expenses against FAMI.

To the extent that the City/County Defendants seek to apply 28 U.S.C. § 1927 against Arbuckle, the general counsel of FAMI, the Court has additional concerns. FAMI was not a party to this case at the time of the mediation. The basis for the claimed sanctions sought by the City/County Defendants all occurred before FAMI sought to intervene in this case. Thus, while Arbuckle was acting as an attorney when he appeared at the mediation on behalf of FAMI, he was not in the normal position of an attorney of record for a party as was counsel in Hamilton. Moreover, while the Court has rejected Arbuckle's position as to the events which occurred during the mediation, the Court does not find that Arbuckle's actions, when viewed objectively, manifest either intentional or reckless disregard of an attorneys duties to the Court. Hamilton, 591 F.3d at 1202. Therefore, the Court finds that no fees or expenses should be assessed against either FAMI or Arbuckle under the provisions of 28 U.S.C. § 1927.

The City/County Defendants also cite the Court's inherent authority to assess attorneys fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, citing Chambers v. NASCO, Inc., 501 U.S. 32, 44-46 (1991)

and <u>Dehning v. Child Dev. Svcs. Of Fremont County</u>, 261 Fed. Appx. 75, No. 07-8008, 2008 WL 123533 (10th Cir., Jan. 11, 2008). The Court agrees that it has the inherent authority to assess attorneys fees when a party has acted in bad faith, vexatiously, wantonly or for oppressive reasons. However, as noted above, the Court does not find that the actions of either FAMI or Arbuckle in this case rise to that level. Therefore, the Court refuses to exercise its inherent authority to assess attorneys fees under the facts and circumstances of this case.

## CONCLUSION.

Based upon the above findings of fact and conclusions of law, the Court finds that judgment should be entered in favor of the City/County Defendants and against FAMI on the crossclaim of the City/County Defendants (Doc. 292) in the amount of $100,000. Also, judgment should be entered in favor of the City/County Defendants and against FAMI on the crossclaim of FAMI. (Doc. 291.)

The Court further finds that prejudgment interest should be awarded to the City/County Defendants on the $100,000 judgment pursuant to the provisions of K.S.A. 16-201 at the rate of 10% per annum, from January 25, 2010[7] to the date of entry of judgment in this case.

---

[7] This date is five days after the City/County Defendants executed the settlement agreement and subsequently made demand on FAMI for payment. *See supra* page 5 at ¶¶ 10-12.

The $100,000 judgment, plus the prejudgment interest awarded above, shall draw interest at the rate provided by 28 U.S.C. § 1961, from the date of entry of judgment in this case until paid.

IT IS SO ORDERED.

Dated at Wichita, Kansas, on this 7th day of September, 2010.


_____s/ DONALD W. BOSTWICK_____
DONALD W. BOSTWICK
United States Magistrate Judge